IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| CATHERINE HERROD and ALAN PARKINSON as guardians ad litem for SCOTT HERROD, TAYLOR HERROD, ELIZABETH HERROD, minors, CATHERINE HERROD, NILES HERROD, and JANET HERROD,<br><br>Plaintiffs,<br><br>vs.<br><br>WILSHIRE INSURANCE CO.<br><br>Defendant,<br><br>vs.<br><br>ESPENSCHIED TRANSPORT, CORP., a Utah corporation and DATS TRUCKING, INC.<br><br>Third-party Defendants. | MEMORANDUM DECISION AND ORDER<br><br><br><br>Case No. 1:09 CV 109<br><br>Judge Dee Benson |

The plaintiffs and defendant Wilshire Insurance Company both move for summary judgment. The court heard oral argument on the cross-motions on April 28, 2010. L. Rich Humpherys appeared as counsel for the plaintiffs and Nelson Abbott appeared as counsel for defendant Wilshire Insurance. At the conclusion of oral argument, the court granted the parties

additional time to brief issues raised during the hearing. Oral argument on the supplemental briefing was held on July 8, 2010. Counsel for both parties argued, and the court took the case under advisement at the conclusion of that hearing. Now, having fully reviewed the parties' written submissions and considered their oral presentations, the court enters the following Memorandum Decision and Order.

BACKGROUND

This is a case about whether an insurer that issued a motor carrier an Endorsement(s) for Motor Carrier Policies of Insurance for Public Liability under Sections 29 and 30 of the Motor Carrier Act of 1980, also called an MCS-90, is required to pay out the endorsement for a judgment entered against its client when there is more than one motor carrier involved in the incident and at least one MCS-90 endorsement has already been paid out. Because this case is before the court on cross-motions for summary judgment, the court examines the evidence that supports each party's claims in the light most favorable to the nonmoving party. *Albright v. Attorney's Title Ins. Fund*, 504 F.Supp.2d 1187, 1192 (D. Utah 2007). Accordingly, the facts set forth below do not constitute findings of fact. *Id.*

The Accident and Subsequent Lawsuit

Kimball Herrod was driving his car on Interstate 15 when a wheel came off the trailer of a double-wheeled semi-trailer truck driving at freeway speed in the opposite direction. The wheel flew across the median and struck the Herrods' car, killing Kimball Herrod. At the time of the accident, DATS Trucking, Inc. owned and insured the tractor involved in the accident. Espenschied Transport Corporation owned the trailer and had leased it to DATS.

Kimball Herrod's family, the plaintiffs, brought a wrongful death suit against DATS Trucking, Espenschied Transport, and others, alleging negligence by both defendants. Espenschied contacted its insurer, Wilshire Insurance, and attempted to refer the defense of the personal injury suit to Wilshire. Wilshire Insurance determined that the trailer was not listed on the schedule of covered vehicles for Espenschied's liability policy and declined coverage for the accident. Wilshire Insurance subsequently declined to participate in defending the suit or settlement discussions.

The Settlement

The Herrods settled their claims with Espenschied on June 26, 2007. (Dkt. No. 11, Def.'s Mem. in Supp., Ex. L). In the executed settlement agreement, Espenschied agreed to an entry of judgment in favor of the Herrod family and to pay $1,100,100 with 10 percent interest for a total judgment of $1,292,499.99. (Dkt. No. 11, Def.'s Mem. in Supp., Exs. L & O). The Herrods agreed to not collect any noninsurance assets from Espenschied until the claims against the other parties were resolved and to never pursue collection against the principals of Espenschied or against Espenschied Transportation Corporation if the effect would expose the personal assets of the corporation's principals. (Dkt. No. 11, Def.'s Mem. in Supp., Ex. L, ¶ 2). In other words, the Herrods agreed to collect the amount owed by Espenschied from its liability insurer, Wilshire Insurance Company. (Dkt. No. 11, Def..'s Mem. in Supp., Ex. O, ¶ 2). That same day, Espenschied assigned its claims against DATS Trucking, such as claims for liability, insurance indemnity, or consequential damages, to the Herrods. (Dkt. No. 11, Def.'s Mem. in Supp., Ex. N). As anticipated by the Herrods' and Espenschied's settlement agreement, a separate

confessed judgment was entered against Espenschied and DATS. (Dkt. No. 16, Pls.' Mem. in Supp. iv).

A few months later in the fall of 2007, the Herrods settled their claims against DATS with DATS Trucking and its insurers. (Dkt. No. 11, Def..'s Mem. in Supp., Ex. Q). As part of that settlement, DATS and its insurers agreed to pay the Herrod plaintiffs $2,264,000, with periodic payments extending until May 5, 2030. The DATS settlement stated that "this settlement is a compromise of a doubtful and disputed claim, and the payments are not to be construed as an admission of liability on the part of the Defendant, by whom liability is expressly denied." (*Id.* ¶ 1.4) At the same time that DATS and the Herrods reached a settlement, the Herrods and Espenschied released DATS from liability by executing a separate Settlement Agreement and General Release. (Dkt. No. 11, Def.'s Mem. in Supp., Ex. P). This agreement was also explicit that it should not be construed as an admission of liability by DATS and its insurers. (*Id.* ¶ 4).

Espenschied did not have direct insurance for the trailer involved in the accident as it was not listed on Wilshire's schedule of covered vehicles. Espenschied did, however, have MCS-90 coverage under its policy with Wilshire.

The Demand for MCS-90 Payment from Wilshire Insurance Company

Two years after the parties settled, the plaintiffs sued Wilshire Insurance Company in this court, arguing that pursuant to the MCS-90 endorsement included in Espenschied's liability policy with Wilshire Insurance, Wilshire was liable to the Herrods for the liability policy limit, $1,000,000 plus interest.

The Wilshire MCS-90 Endorsement to Espenschied's policy read as follows:

> The insurance policy to which this endorsement is attached provides automobile liability insurance and is amended to assure compliance by the insured, within the limits stated herein, as a motor carrier of property, with Sections 29 and 30 of the Motor Carrier Act of 1980 and the rules and regulations of the Federal Highway Administration (FHWA) and the Interstate Commerce Commission (ICC).
> In consideration of the premiums stated in the policy to which this endorsement is attached, the insurer (the company) agrees to pay, within the limits of liability described herein, any final judgment recovered against the insured for public liability resulting from negligence in the operation, maintenance or use of motor vehicles subject to the financial responsibility requirements of Sections 29 and 30 of the Motor Carrier Act of 1980 regardless of whether or not each motor vehicle is specifically described in this policy . . . . However, all terms, conditions, and limitations in the policy to which the endorsement is attached shall remain in full force and effect as binding between the insured and the company. The insured agrees to reimburse the company for any payment made by the company on account of any accident, claim, or suit involving a breach of the terms of the policy, and for any payment that the company would not have been obligated to make under the provisions of the policy except for the agreement contained in this endorsement.

(Dkt. No. 11, Def..'s Mem. in Supp., Ex. H). This language closely tracks the model policy described in the federal regulations implementing the Motor Carrier Act. *See* 49 C.F.R. § 387.15.

MCS-90

In 1980, Congress passed the Motor Carrier Act, 49 U.S.C. § 10101 *et seq.*, in order "to deregulate the trucking industry, increase competition, reduce entry barriers, and improve quality of service . . . ." *Carolina Cas. Ins. Co. v. Yeates*, 584 F.3d 868, 873 (10th Cir. 2009). The Act also addressed abuses in the trucking industry that threatened public safety, including motor carriers' use of "leased or borrowed vehicles to avoid financial responsibility for accidents that occurred while goods were being transported in interstate commerce." *Canal Ins. Co. v. Distrib. Servs., Inc.*, 320 F.3d 488, 489 (4th Cir. 2003); *see also Empire Fire & Marine Ins. Co. v. Guar.*

5

*Nat'l Ins. Co.*, 868 F.2d 357, 362 (10th Cir. 1989) (noting that leased vehicles were used to avoid safety regulations governing equipment and drivers or to confuse the public about who was responsible for accidents caused by nonowned vehicles). In particular, the Act and the subsequent regulations enforcing it require every motor carrier registered to engage in interstate commerce to comply with minimum financial responsibility requirements by filing "a bond, insurance policy, or other type of security" in a specific amount depending on the type of cargo being transported. 49 U.S.C. § 13906(a)(1); 49 C.F.R. § 387. The regulations specifically require a motor carrier to have an approved self-insurance program, a surety bond, or an "Endorsement(s) for Motor Carrier Policies of Insurance for Public Liability under Sections 29 and 30 of the Motor Carrier Act of 1980," commonly referred to as an MCS-90, issued by an insurer. It is this last guarantee of financial responsibility that is at issue in this case. 49 C.F.R. § 387.7(d); *Canal Ins. Co.*, 320 F.3d at 489.

## STANDARD OF REVIEW

Both parties seek to resolve this case on summary judgment. The court may grant summary judgment only if "there is no genuine issue as to any material fact and [if the moving party] is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56. "A 'material fact' is one 'that might affect the outcome of the suit under the governing law, and a 'genuine' issue is one for which 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Pelt v. Utah*, 539 F.3d 1271, 1280 (10th Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)) (internal citation omitted).[1]

---

[1] In addition to its motion for summary judgment and opposition to the Herrod plaintiffs' motion for summary judgment, Wilshire moves this court for additional time to conduct

DISCUSSION

I. MCS-90 ENDORSEMENTS IN MULTI-CARRIER INCIDENTS

An "MCS-90 endorsement comes into play . . . only where (1) the underlying insurance policy to which the endorsement is attached does not otherwise provide liability coverage, and (2) the carrier's other insurance coverage is either insufficient to satisfy the federally-prescribed minimum levels of financial responsibility or is non-existent." *Carolina Cas. Ins. Co. v. Yeates*, 584 F.3d 868, 881 (10th Cir. 2009).

In this case, the two circumstances above have been satisfied. Espenschied's policy to which an MCS-90 endorsement is attached does not cover the trailer involved in the accident at issue and Espenschied has no other insurance; however, in this case, another carrier has already paid the federally prescribed minimum levels for that carrier. This raises a question of first impression: is an insurer required to pay out an MCS-90 endorsement to a third-party injured by the negligence of one its clients when there is more than one motor carrier assigned liability and at least one MCS-90 endorsement or other avenue of satisfying the financial responsibility obligation has already been paid out?

Wilshire argues that federal law requires that only one MCS-90 endorsement, or other satisfaction of financial responsibility, be paid out to an injured party, regardless of how many motor carriers were involved in an incident. In this case, Wilshire argues that because the

---

discovery pursuant to Federal Rule of Civil Procedure 56(f). Wilshire represents that in filing their summary judgment motions, the parties relied on the discovery conducted in state litigation regarding the same underlying events and that if such evidence is insufficient in this federal matter, Wilshire should be allowed additional time to gather proper evidence. In considering these motions, the court does not find that there is insufficient evidence and accordingly denies the motion for a continuance.

Herrod plaintiffs[2] collected the federally mandated minimum, $750,000, in their settlement with DATS, the Wilshire MCS-90 endorsement does not apply.

In contrast, the Herrod plaintiffs contend that each individual motor carrier is responsible for judgments entered against it, and if an individual motor carrier's insurance is insufficient to cover the federal minimum, the MCS-90 policy for that carrier should apply. Since Espenschied is liable on a judgment separate from DATS that it cannot pay, the Herrods assert that Wilshire must pay out on the MCS-90 endorsement attached to Espenschied's liability policy.[3]

Both parties rely on *Carolina Casualty Insurance Co. v. Yeates,* 584 F.3d 868 (10th Cir. 2009), in presenting their arguments; but this case is not directly on point. *Yeates* addressed the required payment of MCS-90 policies when one motor carrier had multiple insurance policies. *Yeates*, 584 F.3d at 871-72. In that case, the motor carrier specifically insured the truck involved in an accident with State Farm and then also carried general liability insurance with Carolina Casualty. *Id.* After State Farm paid its policy limit of $750,000, which was also the regulatory minimum, Carolina Casualty sought a declaratory judgment that it had no liability under its general liability policy. *Id.* Characterizing an MCS-90 policy as a surety obligation, the *Yeates*

---

[2] Wilshire also challenges the Herrod plaintiffs' standing to pursue insurance proceeds from Wilshire. This argument is without merit. "The peculiar nature of the MCS-90 endorsement grants the judgment creditor the right to demand payment directly from the insurer, and simultaneously grants the insurer the right to demand reimbursement from the insured." *Canal Ins. Co. v. Underwriters at Lloyd's London*, 435 F.3d 431, 442 n.4 (3rd Cir. 2006); *see also Carolina Cas. Ins. Co.*, 584 F.3d at 879.

[3] Imbedded in the parties' arguments appears to be a dispute about what amount Wilshire is obligated to pay based on its MCS-90 endorsement–the $750,000 statutory minimum or the $1,000,000 policy limit. This issue was not directly addressed in the parties' briefs nor argued to the court; therefore, the court makes no conclusion regarding what amount an MCS-90 provider such as Wilshire is required to pay.

8

court agreed, concluding that an "MCS-90 endorsement does not apply once the federally-mandated minimums have been satisfied" by a motor carrier, whether through one insurance policy or an aggregate of policy proceeds. *Id.* at 879, 886. Limited to the facts of the case, *Yeates* in no way addressed whether financial responsibility minimums required by the Motor Carrier Act are assigned per incident or per carrier. Unpersuaded by the parties' arguments that *Yeates* is dispositive, the court will start at the beginning–the statute itself and its implementing regulations.

Based on the language of the statute, there is no merit in Wilshire's position. The statute and CFR require that **"each** motor carrier registered to engage in interstate commerce" have a bond, insurance policy, or other security, such as an MCS-90 endorsement, sufficient to pay the minimum financial responsibility "for **each** final judgment against" the motor carrier for bodily injury or death resulting from the negligent operation, maintenance, or use of motor vehicles. *Canal Ins. Co. v. Distrib. Servs., Inc.*, 320 F.3d 488, 489 (4th Cir. 2003) (emphasis added); 49 U.S.C. § 13906 (emphasis added). Neither the statute and regulations nor the case law interpreting them ever say, or suggest, that once the injured person received the statutory minimum from one tortfeasor, the MCS-90 protection for all other negligent parties vanishes. Instead, the regulations repeatedly refer to the financial responsibility requirement of "the motor carrier,"and other singular references to one motor carrier. This usage implicates that motor carriers are held to the financial responsibility individually and each motor carrier is responsible for each judgment against it. *See, e.g.,* 49 C.F.R. § 387.7(a). This interpretation is also supported by Congress's purpose in requiring a financial responsibility obligation–to combat the "use . . . of leased or borrowed vehicles to avoid financial responsibility . . . ," *Canal Ins. Co.*,

9

320 F.3d at 489, and to "assure that injured members of the public are able to obtain judgment from negligent authorized interstate carriers." *John Deere Ins. Co. v. Nueva*, 229 F.3d 853, 857 (9th Cir. 2000). Requiring only one motor carrier to satisfy its financial responsibility would limit an injured party to collecting from only one negligent carrier.

Still, Wilshire argues that public policy considerations support payment of only one endorsement per incident. First, Wilshire argues that the MCS-90 endorsement should not operate to make it liable for a claim for which no premium was paid, but, this is precisely what the MCS-90 endorsement was designed to do–insure payment on a claim for which there is inadequate or no insurance. This does not rewrite the contract between the insurer and insured, instead the endorsement provides that "all terms, conditions, and limitations in the policy to which the endorsement is attached shall remain in full force and effect . . ." and requires the insured to reimburse the insurer "for any payment the company would not have been obligated to make under the provisions of the policy except for the agreement contained in this endorsement." "In sum, the MCS-90 endorsement creates an obligation entirely separate from other obligations created by the policy to which it is attached." *Yeates*, 584 F.3d at 884. Similarly, applying an endorsement to a claim does not rewrite an agreement between carriers as to how to assign risk. *Cf. id. at* 882 ("Consequently, with respect to the ultimate allocation of responsibility, the MCS-90 endorsement should be irrelevant."). That is also a matter separate from the endorsement's application.

Wilshire also argues that obligating each motor carrier charged with negligence in an incident with financial responsibility will create an inequity between persons injured in accidents with one motor carrier and persons injured in accidents with multiple motor carriers. For

10

instance, Wilshire asserts that if one person is injured in an accident with equipment owned by three different motor carriers and another person is injured in a similar accident but the equipment is all owned by one company, the first party will recover three times more from the motor carriers. This hypothetical is misleading. If the Motor Carrier Act's MCS-90 requirement is applied to each motor carrier, the injured party would only recover more if each motor carrier was negligent. In many cases negligence is asserted against only one party. *See, e.g., Royal Indem. Co.*, 99 F.3d 964, 966 (10th Cir. 1996). And even if negligence is asserted against each motor carrier, this is a reality of tort law. A party injured by the negligence of many compared to the negligence of one has the right to recover from each negligent party. Moreover, accepting this argument would create an incentive counter to the purpose of the MCS-90 endorsement. When multiple defendants are named but the plaintiff is limited to only one financial responsibility obligation, it would be beneficial for each party to wait the others out in a "game of 'chicken'" and thereby avoid being "tagged first by the injured party . . . [to] shoulder[] the entire financial liability." *Redland Ins. Co. v. Shelter Mut. Ins. Co.*, 193 F.3d 1021, 1022-23 (8th Cir. 1999). This cannot be what Congress intended by creating the financial responsibility obligations.

Therefore, based on the statute and the regulations, as well as their initial purpose, the court concludes that each motor carrier is required to satisfy the financial responsibility requirements, including paying out on an MCS-90 endorsement where applicable.

## II. APPLICABILITY OF FINANCIAL RESPONSIBILITY REQUIREMENT TO ESPENSCHIED/WILSHIRE

Aside from its argument that the minimum financial responsibility requirement has

11

already been satisfied, Wilshire raises three additional arguments to avoid financial responsibility to the Herrod plaintiffs under the Motor Carrier Act. First, Wilshire argues that Espenschied was not operating as a carrier at the time (that is, Espenschied was not using, operating, or maintaining). Second, Wilshire argues that there was not a final judgment for "public liability resulting from negligence in operating, maintaining or using a motor vehicle subject to" the Motor Carrier Act. And third, Wilshire argues that there was an allocation of risk between the companies that assigned all risk to DATS. None of these arguments have merit.

To begin, Espenchied was a motor carrier accused of negligence in its maintenance of the trailer. The MCS-90 requires payment for injury "resulting from negligent operation, maintenance, or use of motor vehicles." 49 U.S.C. § 13906. Wilshire argues that because DATS, via contract, was responsible for maintaining the trailer and because DATS was operating and maintaining the trailer, Espenschied's MCS-90 policy should not apply. However, by its own admission, Espenschied is a registered motor carrier and because it owned the trailer, at some point it was responsible for the maintenance of the trailer. The Herrods sued Espenschied for negligent maintenance. Therefore, the court concludes that as a motor carrier accused of negligence, Espenschied's MCS-90 is at issue. Additionally, Wilshire's argument is counter to the entire purpose of the financial responsibility obligation. "Attempts to circumscribe liability by the use of leased or borrowed vehicles was the impetus behind the ICC's mandating the MCS-90 endorsement." *John Deere Ins. Co. v. Nueva*, 229 F.3d 853, 857 n.5 (9th Cir. 2000); *Empire Fire & Marine Ins. Co. v. Guar. Nat'l Ins. Co.,* 868 F.2d 357, 3612. The requirement was created to avoid the very confusion created by the use of non-owned vehicles. *Yeates*, 584 F.3d at 873 n.2 (quoting *Empire Fire & Marine Ins. Co. v. Guar. Nat'l Ins. Co.*, 868 F.2d 357,

12

362 (10th Cir. 1989)).

Wilshire's second argument is also faulty. Settlements of actual negligence claims formalized into a consent judgment qualify as a final judgment. As explained by the *Yeates* court, "the provisions of [the MCS-90 policy] were designed to ensure collectability of a judgment . . . ." The MCS-90 was not designed "to relieve the injured member of the public from the requirement that he or she obtain a final judgment of legal liability against the motor carrier . . . ." *Yeates*, 584 F.3d at 875, 879. In this case, the Herrod plaintiffs have a final judgment of legal liability against Espenschied. Wilshire argues that the consent judgment did not include an admission of liability, let alone a finding or judgment of negligence. Instead, Wilshire argues this is an unresolved issue of fact. For support, Wilshire cites *Green v. Royal Indem. Co.*, 93 Civ. 4335, 1994 U.S. Dist. Lexis 7948, at *9 (S.D.N.Y. June 15, 1994), which held that a consent judgment was only presumptive or prima facie evidence that a motor carrier acted negligently. *Id.* at *9-10. This presumption, according to the *Green* court, could be rebutted with a showing that the judgment was obtained through "bad faith, fraud, or factual or legal error."[4] The court does not find this case persuasive.[5] The Motor Carrier Act requires only a final judgment, not a judgment on the merits. *See* 49 U.S.C. § 13906. Moreover, as criticized

---

[4] The *Green* court went on to explain that a plaintiff needs only show negligence on the part of someone, not necessarily on the part of the insured. *Green at *12*.

[5] Although the court is not persuaded by the *Green* court's holding regarding a finding of negligence, the court notes that the court's overall view of the law is in harmony with this court's decision in this case. In describing the application of the MCS-90 policies the court stated that "where two motor carriers . . . were held liable for Green's death . . . . [the] plaintiff is entitled to recovery from two different insurers under two endorsements." *Green*, 1994 U.S. Dist. LEXIS 7948, * 17.

13

by the Eastern District of Michigan, this rule would allow parties who refuse to participate, as was the case with Wilshire in this case, to later come in and collaterally attack a final decision. *Hawthorne v. Lincoln Gen. Ins. Co.*, 08-12325, 2009 U.S. Dist. Lexis 9329, *16-17 (E.D. Mich. Feb. 9, 2009).

Finally, any allocation of risk between the parties is not relevant to a determination of the duty to pay out under MCS-90. This is a contract dispute between DATS and Espenschied that is independent of the MCS-90 issue. As discussed above, Wilshire is obligated to pay the MCS-90 liability and then, if warranted, may seek indemnification if it agreed to allot risk differently. *See Carolina Cas. v. Yeates*, 584 F.3d 868, 882, 885 (10th Cir. 2009) ("[W]ith respect to the ultimate allocation of responsibility, the MCS-90 endorsement should be irrelevant." "[I]f an insurer, which otherwise has no liability for an accident but for the MCS-90 endorsement, pays out the financial responsibility minimums as governed by the regulations, that insurer is not without recourse; it may still seek reimbursement from the motor carrier."). The determination of liability among motor carriers and insurers is separate from the financial responsibility obligation owed to the public. Thus, once the "public . . . [is] protected, the parties are then free, as among themselves, to allocate risk however they choose." *Adams v. Royal Indem. Co.*, 99 F.3d 964, 969 (10th Cir. 1996).

In conclusion, because the Herrod plaintiffs asserted independent negligence claims against DATS and Espenschied, both motor carriers are obligated to meet the Motor Carrier Act's financial responsibility requirements. Espenschied does not have adequate insurance to satisfy this obligation and therefore its MCS-90 policy provided by Wilshire is applicable. This policy is triggered by the consent judgment and the fact that Espenschied was a motor carrier

14

accused of negligent maintenance. The leasing agreement between Espenschied and DATS, which included an allocation of risk, does not alter this application. Instead, Wilshire is required to pay on its MCS-90 policy and thereafter may seek to recover from Espenschied or others any monies for which it does not believe it is liable.

Accordingly, defendant Wilshire's motion for summary judgment is DENIED and the plaintiff's motion is GRANTED.

IT IS SO ORDERED.

DATED this 5th day of August, 2010.

_____
Dee Benson
United States District Judge